**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **RICHARD NEWKIRK WILDER,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.  7:06-CV-1774-RDP** |
| } | |
| **SIGMA NU FRATERNITY, et al.,** } | |
| } | |
| **Defendants.** } | |

**<u>MEMORANDUM OPINION</u>**

The court has before it Defendants' Motion for Summary Judgment filed February 29, 2008.

(Doc. # 54.)  The motion has been fully briefed and was deemed submitted, without oral argument,

on April 9, 2008.  For the reasons outlined below, the court finds that there are no disputed issues

of material fact and Defendants are entitled to judgment as a matter of law.  Therefore, Defendants'

motion is due to be granted.

**I.      Legal Standards for Evaluating a Summary Judgment Motion**

Summary judgment is proper only when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law

will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are

resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for

summary judgment always bears the initial responsibility of informing the court of the basis for its

motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence

in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.    Procedural History

On September 7, 2006, Plaintiff Richard Wilder filed a Complaint alleging the following claims: negligence; negligent hiring, training, and supervision; assault; battery; trespass; and wantonness against Defendants Sigma Nu Fraternity, Inc. ("Sigma Nu"), Theta Chapter of Sigma Nu ("Theta Chapter"), Sigma Nu Chapter House Co., Inc. ("Chapter House"), and Kenneth Gipson ("Gipson").  (Doc. # 1).  On January 18, 2007, Plaintiff filed an Amended Complaint. (Doc. # 23). Against the organizational Defendants, Plaintiff's Amended Complaint states the following claims: (1) Count I - Negligence, (2) Count II - Negligent Hiring, Training and Supervision, and (3) Count V - Wantonness.  (Doc. # 23 at 4-7).  On April 18, 2007, Plaintiff requested that the court dismiss Defendant Theta Chapter  (Doc. # 39, ¶ 4), and on June 12, 2007, and that entity was dismissed.

(Doc. # 44).  On  February 29, 2008, Defendants Sigma Nu and Chapter House moved for summary judgment on all of Plaintiff's claims against them.  (Doc. # 54).

Plaintiff has submitted separate responses to Defendants' motion for summary judgment, one addressing his claims against Sigma Nu and the other addressing his claims against Chapter House. (Docs. # 55 and # 56).  As to Defendant Chapter House, Plaintiff only opposes entry of summary judgment on his negligent hiring, training, and supervision claim (Count II).  (Doc. # 56 at 22).  As to Defendant Sigma Nu, Plaintiff opposes summary judgment on both his negligence and his negligent hiring, training, and supervision claims (Counts I and II).  (Doc. # 55).[1]  Plaintiff has not opposed Defendant Chapter House's motion for summary judgment with respect to either his negligence or his wantonness claim, indicating that he does not oppose the motion on these claims, and has chosen to abandon them. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## III.   **Relevant Undisputed Facts**[2]

Plaintiff's claims arise out of an incident that took place in the early morning hours of Saturday, September 11, 2004, at a band party held at a house rented by the Theta Chapter of Sigma Nu located on the campus of the University of Alabama in Tuscaloosa, Alabama.   (Doc. # 1, at 2). Plaintiff, who was a member of Sigma Nu and a student at the University of Alabama, received an

---

[1]Plaintiff opposes entry of summary judgment in favor of Sigma Nu on his wantonness claim, but has only stated that opposition in a footnote.  (Doc. # 55 at 20).

[2]If facts are in dispute, the court has noted the dispute, but will "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotations omitted).

4

invitation and attended the band party.  (Doc. # 1, at 2).  After the party was over, two strangers,

Kenneth Gipson and Reginald Barnes, entered the fraternity house.  (Lindsey at 62-63).  After certain

fraternity members escorted them from the house, a fight ensued near the street in which Gipson

stabbed Plaintiff in the head.  (Broder at 31-33; McLin at 93, 128).

Sigma Nu Fraternity, Inc. is a corporation founded at the Virginia Military Institute in

Lexington, Virginia in the 1800s.  (Beacham at 134).  The corporation was formed to promote

principles of fraternity.  (Beacham at 134).  Theta Chapter is the local chapter of Sigma Nu operating

at the University of Alabama.  (Beacham at 168).   The fraternity house sits on land owned by the

University of Alabama and leased by Chapter House.  (Land at 16-17).  Chapter House owns the

house and, in exchange for rent, permits the Theta Chapter and its members to occupy the building.

(Land at 19-20).

Sigma Nu has adopted certain guidelines for its member chapters and members.  (Beacham

at 554-5, 135-50; Pl. Ex. 2 at p. 10; Pl. Ex. 27 at 1.)  Among the guidelines published by Sigma Nu

are the Risk Reduction Policy and Guidelines of Sigma Nu Fraternity, Inc. (the "Risk Reduction

Policy"), the Sigma Nu Ethical Leadership Program Phase I Participant Manual, Session 8:  Risk

Reduction (the "LEAD Manual"), and The Law of Sigma Nu Fraternity, Inc. (the "Law"). (Beacham

at 54-55, 135-50; Pl. Ex. 2, pp. 10-13; Pl. Ex. 3; Pl. Ex. 27; Pl. Ex. 28). Sigma Nu has provided

educational guidance to Theta Chapter members with regard to the Risk Reduction Policy and the

LEAD Manual.  (Lindsey at 14-20, 71-84; Affidavit of Brad Beacham).  At least once during each

school semester, a representative of Sigma Nu met with Theta Chapter's officers at the fraternity

house and instructed the officers on the Risk Reduction Policy and the LEAD Manual.  (Lindsey at

17-20, 74-77; McLin at 32-33, 47-51).  Theta Chapter's members understood that they were subject

to discipline by Sigma Nu if they did not abide by Sigma Nu's rules, policies and guidelines. (Lindsey at 82-84, 127-28). If Sigma Nu determines that collegiate chapters and/or members are not complying with its published guidelines, it has the authority to suspend or expel individual members and suspend or revoke a local chapter's charter. (Beacham at 554-5, 135-50, Pl. Ex, 2 at p. 10, Pl. Ex. 27 at 1).

The Risk Reduction Policy published by Sigma Nu contains a form affidavit wherein the officers acknowledge, among other things: 1) that Theta Chapter, its officers and its members are subject to discipline by Sigma Nu for violating the Risk Reduction Policy; 2) that alleged or suspected violations of the Risk Reduction Policy will lead to an immediate, temporary suspension of Theta Chapter's charter with an investigation to be conducted by Sigma Nu; and 3) that the officers have reviewed and discussed the Risk Reduction Policy with Chapter House. (Beacham at 128-29; Pl. Ex. 2, at p. 18; Pl. Ex. 26). The affidavit is also executed by Chapter House, wherein it pledges to assist the particular chapter to reduce risks among its members and guests. (Pl. Ex. 2, at p. 18; Pl. Ex. 26). This form was executed by all relevant parties in 2000. (Pl. Ex. 26).

With regard to handling intruders at parties, the LEAD Manual instructs members that, "[i]f an uninvited guest shows up, especially if he/she is under the influence, encourage the intruder to leave." (Pl. Ex. 3, at p. 165). The Manual provides that, "[i]f someone appears to be creating an altercation at a chapter function…such as a potential fight, call on the chapter leadership to cautiously intervene." (Pl. Ex. 3, at p. 165). It further instructs members to call the police if the intruder does not leave. (Pl. Ex. 3, at p. 165). There is evidence that, although some Theta Chapter members were trained on these issues at certain times, not all members recalled being trained on these issues each year. (Broder at 18-21; Singleton at 58-61; Stewart at 24-31).

6

The party where Plaintiff was injured was registered by Theta Chapter with the University as an "open" party lasting from 10 p.m. to 2 a.m. where alcohol would be present. (Lindsey at 25-26; Plf. Ex. 5). During the party, the members of Theta Chapter attempted to control access to the party by providing one entrance in the back of the house, and all points of entry other than the back door were closed and locked. (Lindsey at 35, 61). After the band quit playing and the party ended, the front door was unlocked to allow party guests to leave more easily. (Lindsey at 62-63).

Numerous members of the Theta Chapter of Sigma Nu were present at the party, including members John Lindsey, Hunt Mobley, Matt McLin, Tod Singleton, Chase Elmore, Will Stewart and Colin Broder. (Broder at 13-14, 25; Elmore at 14-15, 31-32; Lindsey at 9, 39; McLin at 12, 21-26, 62; Mobley at 13-15, 18-19; Singleton at 11-12, 29-32; Stewart at 20-21, 33-34). At that time, Lindsey, McLin and Mobley were officers of Theta. (Lindsey at 11; McLin at 26; Mobley at 17). Specifically, Lindsey was the Commander (president), McLin was the Lieutenant Commander (vice-president), and Mobley was the Marshall and House Manager. (Lindsey at 11; McLin at 23, 26; Mobley at 17).

There is no evidence that either Sigma Nu or Chapter House was involved in the planning or organization of the party. There is no evidence that either Defendant had any knowledge of the party or of the presence of Kenneth Gipson and Reginald Barnes at the house until afterward. At the time Defendants learned of the party, the events giving rise to Plaintiff's claims had already occurred. (Beacham Aff.; Beacham depo., generally).

7

During the early hours of the morning of September 11, 2004, as the party was ending and after the band hired for the party had stopped playing,[3] the front door of the fraternity house was unlocked and opened.  (Lindsey at 62-63).  Kenneth Gipson and Reginald Barnes entered the house through the front door.  (Lindsey at 62-63).  Mobley, as he was exiting the front door of the house, observed Gipson and Barnes entering the house.  (Mobley at 26).  Mobley was suspicious of Gipson and Barnes, and re-entered the house in order to observe them.  (Mobley at 47-48).  Mobley then observed one of them pick up a set of keys that were on a table.  (Mobley at 47-48).  Mobley was concerned about leaving Gipson and Barnes in the house since some of the bedrooms in the house have open doors.  (Mobley at 48-49).  Mobley then solicited the help of McLin and Elmore to remove Barnes and Gipson from the house.  (Elmore at 43-45;  McLin at 98-99;  Mobley at 26-28, 48-51).

Mobley, Elmore and McLin confronted Gipson and Barnes in the dining area.  (Elmore at 45-48;  McLin at 64, 99;  Mobley at 28-29, 51-52).  At that time, Barnes was pulling two bottles of beer out of an icemaker.  (Elmore at 46-48;  McLin at 64;  Mobley at 29, 53-55).  Mobley, Elmore and McLin suspected that Gipson and Barnes were stealing someone else's beer; in fact, Elmore believed that it was Elmore's bottled beer that Gipson and Barnes were stealing.  (Elmore at 47-48;  McLin at 100;  Mobley at 83-84).  Mobley questioned Barnes and Gipson about the beer and who, if anyone, they knew at the house.  (McLin At 64-65, 100).  Mobley, Gipson and Barnes exchanged words, and the conversation became heated.  (Elmore at 49;  McLin at 67;  Stewart at 40-42).

---

[3]Plaintiff represents that the band was "about to quit playing" at the time the incident occurred.  He cites Lindsey (at 45), McLin (at 87) and Stewart (at 36) for that proposition.  The record evidence cited by Plaintiff does not support this proposition.  Moreover, portions of McLin's deposition not cited by Plaintiff establish the contrary, *i.e.* that the band had already stopped playing.  (McLin at 105).

Gipson punched McLin in the neck. (Elmore at 49-52, 63; McLin at 68-69, 77, 81-82, 102-03). Elmore broke up the fight and pushed McLin to the other side of the dining area. (McLin at 68-69, 78-83). At some point in the dining room, Gipson pulled a knife, but once things cooled off, Gipson lowered and concealed the knife. (Gipson Aff., at ¶ 13; Stewart at 46-47). Gipson and Barnes then backed out of the front door of the house into the front lawn area, still followed by several Theta Chapter members. (Mobley at 71-72; Elmore at 61-62; Gipson Aff. at ¶ 14, McLin at 81).

Another Theta Chapter member, Broder, joined the group and walked Gipson and Barnes out of the house through the front yard. (Broder at 32-34). Broder was not aware that Gipson had a knife. (Broder at 31, 38-40). Gipson and Barnes walked through the front lawn up to the sidewalk bordering University Boulevard. (Broder at 31-32; Elmore at 65; McLin at 85-86; Mobley at 72-73). When Gipson and Barnes arrived at the sidewalk, Barnes still had the two bottles of beer that he had taken from the icemaker. (Broder at 36-37; McLin at 90-91; Mobley at 73).

At some point, Broder realized Plaintiff was behind him. (Broder at 31-33). When Gipson and Barnes arrived at the sidewalk, Broder was standing in front of Gipson and Barnes. (Broder at 47-50). Plaintiff was standing a couple of feet behind Broder, and others, including Mobley, Elmore and McLin, were standing behind Plaintiff. (Broder at 47-50). Gipson, looking at the crowd in the direction of Plaintiff and McLin, made a statement to the effect that he would kill them if he ever saw them again. (Elmore at 63; McLin at 88-89; Mobley at 75-76). Barnes then threw one or more of the beer bottles that he had taken from the icemaker and hit one or more Theta Chapter members. (Elmore at 66; Gipson Aff., at ¶ 16; McLin at 90; Mobley at 76-77).

Immediately thereafter, the situation became violent.  (McLin at 91).  Plaintiff and Gipson moved toward one another simultaneously.  (McLin at 128).  Gipson stabbed Plaintiff in the head with the butterfly knife.  (McLin at 93, 128).  Although it is unclear whether he made contact, Plaintiff also took a swing at Gipson at the same time Gipson appeared to take a swing at Plaintiff. (McLin at 129).  When it was discovered that Plaintiff had been injured, the police were called to the scene.  (Elmore at 71-72; Mobley at 77-80; Stewart at 52-53).  Gipson fled the state, but was later arrested, returned to Alabama, and charged with attempted murder.  (Simpson at 68-72).  Gipson admitted stabbing Plaintiff. (Simpson at 68-72).

## IV.    Applicable Substantive Law and Analysis

Plaintiff maintains negligent hiring, training and supervision claims against both Defendants and negligence and wantonness claims against Defendant Sigma Nu.

### A.    Negligent Hiring, Training, and Supervision Claim (Count II)

The Alabama Supreme Court recognized a cause of action for negligent training or supervision in *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1002-03 (Ala.1993).  "Alabama law is clear that the tort of negligent supervision or training requires as an element the existence of a master-servant relationship."  *McLaurine v. City of Auburn*, 2007 WL 1548924 *3 n.5 (M.D. Ala. 2007)(quoting *Ott v. City of Mobile*, 169 F.Supp.2d 1301 (S.D. Ala. 2001)).  The typical negligent supervision or negligent training case arises where a plaintiff is injured by an employee or agent of a financially viable corporate or organizational defendant in the course of the employee or agent's employment or other undertaking on the organization's behalf.  The plaintiff seeks to hold the corporate or organizational defendant  liable for injuries caused by the employee or agent.  Here, we are not dealing with the typical scenario.  Plaintiff was injured by Gipson, a stranger to Defendants,

while attending a party about which Defendants were not even aware until after the fact. Nevertheless, Plaintiff argues that certain failures on the part of Defendants and members of Theta Chapter combined to create the situation where Gipson was able to injure Plaintiff.

Before addressing the issue of the existence of a master-servant relationship, "to prove a claim under Alabama law for ..., negligent hiring, negligent supervision or negligent retention, a plaintiff must demonstrate that the [master] knew, or in the exercise of ordinary care should have known, that its [agent] was incompetent." *Britt v. USA Truck, Inc.*, 2007 WL 4554027, *4 (M.D. Ala. 2007) (citing *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001) (negligent supervision); *Bruck v. Jim Walter Corp.*, 470 So.2d 1141, 1144 (Ala. 1985) (negligent/wanton entrustment); *Brown v. Vanity Fair Mills, Inc.*, 277 So.2d 893, 895 (Ala. 1973) (negligent retention); *Sanders v. Shoe Show, Inc.*, 778 So.2d 820, 824 (Ala.Civ.App. 2000) (negligent hiring)). "Liability depends upon it being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge." *Sparks v. Phillips & Cohen Associates, Ltd.*, 2008 WL 2540679 *13 (S.D. Ala. 2008) (quoting *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001)). "It is not sufficient merely to allege, or to show, that the employee acted incompetently." *Sparks*, 2008 WL 2540679 at *13 (quoting *Armstrong Business Services, Inc.*, 817 So.2d at 683). "Thus, a plaintiff bringing a claim of negligent supervision/training must show that the defendant either had actual knowledge of its employee's wrongful acts and did nothing about it, or that it would have known about the employee's wrongful acts had it exercised due and proper diligence." *Sparks*, 2008 WL 2540679 at *13 (citing *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1309 (11th Cir. 2007)).

11

Still putting aside for the moment the master-servant relationship issue, Plaintiff has presented absolutely no Rule 56 evidence that anyone involved in this tragedy was incompetent or acted in an incompetent manner.  Plaintiff argues that various Theta Chapter members acted negligently at the party itself, thereby allowing Gipson's attack on Plaintiff.  Plaintiff has not presented anything showing that any Theta Chapter member was incompetent, or that Defendants had any reason to know (or should have discovered) that they were incompetent based on any prior conduct.

Plaintiff's argument that the Theta Chapter members were negligent (or incompetent) because they allegedly failed to follow certain procedures with respect to the party at issue is unavailing.  Rather, the undisputed facts show that the individuals involved actually carried out some of the steps suggested by the educational materials addressing how to handle intruders. The LEAD Manual instructs members that, "[i]f an uninvited guest shows up, especially if he/she is under the influence, encourage the intruder to leave."  (Pl. Ex. 3, at p. 165).  The Manual further provides that, "[i]f someone appears to be creating an altercation at a chapter function…such as a potential fight, call on the chapter leadership to cautiously intervene." (Pl.  Ex. 3, at p. 165)  It also suggests calling the police if the intruder does not leave.  (Pl. Ex. 3, at p. 165).

When Gipson and Barnes were discovered at the fraternity house, they were approached by Mobley, the Marshall of the fraternity.  Mobley then solicited the help of McLin (the Lieutenant Commander), and Elmore, another member, to encourage Gipson and Barnes to leave.  (Elmore at 43-45;  McLin at 98-99;  Mobley at 26-28, 48-51). After a slight altercation instigated by one of the intruders, the members were able to calm the situation down and the intruders in fact left the house. (Lindsey at 54-57;  Mobley at 72; Elmore at 61-62).  Because the fraternity leadership was able to

12

convince the intruders to leave, the guidelines do not provide that the police should have been called at that point.  In any event, alleged "technical violations" of certain policies or guidelines are "not enough to establish a claim of negligent supervision or training."  *Sparks*, 2008 WL 2540679 at *14. Because Plaintiff has failed to show that any of the Theta Chapter  members were  incompetent, much less that Defendants knew or should have known of that incompetence, he has failed to establish an essential element of his negligent hiring, training and supervision claim.

Having determined that the evidence does not establish one essential element of Plaintiff's negligent hiring, training and supervision claim, it is unnecessary for purposes of that claim to determine whether a master-servant relationship existed between the Theta Chapter members and the Defendants.  Nevertheless, because this analysis is also relevant to Plaintiff's negligence claim against Defendant Sigma Nu, the court will address the issue:

> "Where it is sought to charge an association with liability for the wrongful or tortious acts of a person, the rule is that such liability cannot be asserted where such person is not under the control of the association, or subject at the very time to its right to control his acts. Nor is the association, any more than a corporation, liable for a tort committed outside the course of its business or affairs, in the absence of a subsequent ratification."

*Rothman v. Gamma Alpha Chapter of Pi Kappa Alpha Fraternity*, 599 So.2d 9, 11 (Ala. 1992) (quoting 6 Am.Jur.2d *Associations and Clubs* § 48 (1963)). "College students and fraternity members are not children. Save for very few legal exceptions, they are adult citizens, ready, able, and willing to be responsible for their own actions. Colleges and fraternities are not expected to assume a role anything akin to in loco parentis or a general insurer." *Rothman*, 599 So.2d at 11 (quoting *Campbell v. Board of Trustees*, 495 N.E.2d 227, 232 (Ind.App. 1986)).

As the Pennsylvania Supreme Court observed, "[b]y definition such organizations are based upon fraternal, not paternal relationships. ... Fraternal organizations are premised upon a fellowship of equals; it is not a relationship where one group is superior to the other and may be held responsible for the conduct of the other." *Ass'n v. Sullivan*, 524 Pa. 356, 365, 572 A.2d 1209, 1213 (1990). As such, fraternal organizations generally do not fit into the master-servant mold. Moreover, the existence of such a relationship is even more questionable between the Theta Chapter members and the remaining Defendants in this case.

Sigma Nu is the *national* fraternal organization. Theta Chapter, the local chapter based in Tuscaloosa at the University of Alabama campus, is no longer a Defendant in this case. There is no evidence that any of the Theta Chapter members hold any positions whatsoever with Chapter House or Sigma Nu. Chapter House simply owns the house that is leased to the Theta Chapter. Although Plaintiff disputes that Chapter House's "sole" purpose is to own the house, evidence that Chapter House "pledges to assist Theta Chapter to reduce risks" does not raise a genuine issue of material fact with regard to the existence of a master-servant relationship between it and Theta Chapter members. There is no evidence that either Defendant monitors or controls the day to day activities of the Theta Chapter members. Rather, Defendants are only in a position to impose discipline after the fact. *See Sullivan*, 524 Pa. At 365, 572 A.2d at 1213.

The conceptual difference between a fraternal relationship and a master-servant relationship is revealed by examining the fundamental basis for establishing liability on the master for a servant's acts. "The factual question to be determined is whether or not the act complained of was done, either by agent or servant, while acting within the line and scope of his *employment*." *Terry, By and Through Terry v. Phillips 66 Co., Inc.*, 591 So.2d 33, 37-38 (Ala. 1991) (quoting *Autrey v. Blue*

14

*Cross & Blue Shield of Alabama*, 481 So.2d 345, 347-48 (Ala. 1985)).   Although the term "employment" is not entitled to a literal construction, it cannot be said that either Sigma Nu or Charter House "employed" the Theta Chapter members to host the party at issue.   There is no evidence that Theta Chapter members hosted the party at the behest or on behalf of Defendants. Thus, the underlying premise of a principle-agent or master-servant relationship does not translate to the fraternal context or fit within the facts of this case.

Therefore, the court finds that Plaintiff has failed to establish the existence of a master-servant relationship between the Theta Chapter members and the remaining Defendants in this case. Therefore, for this additional reason, the court finds summary judgment on Plaintiff's negligent hiring, supervision and training claim is appropriate.

### B.      Negligence (Count I)

As discussed previously, Plaintiff was actually injured by Gipson, a third party who has no relationship to either Defendant.  Plaintiff seeks to hold Defendants liable for Gipson's criminal acts. "It is the general rule in Alabama that absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person." *Moye v. A.G. Gaston Motels, Inc.*, 499 So.2d 1368, 1370 (Ala.1986).

The evidence before the court does not support a finding of "special circumstances" which would justify imposing on Defendants a duty to protect Plaintiff from Gipson's criminal conduct.

> Special circumstances arise when the defendant knew or had reason to know of a probability of conduct by [a third person] that would endanger the plaintiff. Knowledge on the part of a premises owner or manager of a probability that harm will be caused to a person on the premises, by the action of a third party, can create a duty on the part of the owner or manager to take reasonable precautions. However, while prior incidents of criminal conduct can indicate the premises owner or manager

had notice that someone on the premises could be harmed by the criminal act of a third person, proof of prior criminal acts does not conclusively establish such notice.

*New Addition Club, Inc. v. Vaughn*, 903 So.2d 68, 73 (Ala. 2004) (quoting *Hail v. Regency Terrace Owners Ass'n*, 782 So.2d 1271, 1274 (Ala. 2000)) (internal quotations omitted).   "[T]he existence of a duty is a question of law to be determined by the trial judge." *State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 839 (Ala.1998).

        For Plaintiff to recover from Defendant Sigma Nu in negligence, "Alabama law requires [him] to show *three elements* to establish a duty that would be the basis for a cause of action such as the one presented in this case.... First, the particular criminal conduct must have been foreseeable. Second, the defendant must have possessed 'specialized knowledge' of the criminal activity. Third, the criminal conduct must have been a probability."   *Vaughn*, 903 So.2d at 73 (quoting *Carroll v. Shoney's, Inc.*, 775 So.2d 753, 756 (Ala. 2000)) (emphasis added). Thus, in order to show that Sigma Nu or the Theta Chapter members had a duty to protect Plaintiff from Gipson's criminal acts, Plaintiff must show that (1) it was foreseeable that Gipson would stab Plaintiff, (2) that Sigma Nu or the fraternity member had specialized knowledge that a stabbing of this type would occur, and (3) that Gipson stabbing Plaintiff was a probability.  *Vaughn*, 903 So.2d at 75 (citing *Ex parte South Baldwin Regional Medical Center*, 785 So.2d 368 (Ala. 2000)).  "In any case in which a defendant faces liability for the criminal actions of a third party, the focus is on whether the criminal activity was foreseeable. *Notably, the Supreme Court has held that the particular criminal activity, not just any criminal activity, must be foreseeable*."  *Vaughn*, 903 So.2d at 75 (quoting *Baldwin*, 785 So.2d at 370 (quoting Carroll, 775 So.2d at 756)) (emphasis added).

Summary judgment is appropriate in the vast majority of cases seeking to hold a defendant liable for the criminal acts of a third party because the particular criminal activity is simply not foreseeable.  Usually, a violent, criminal act occurs without warning.  Plaintiff argues that Gipson stabbing Plaintiff was foreseeable because of the brief altercation  in the dining room when Gipson wielded his knife at the other Theta Chapter  members.  However, this type of notice does not make Gipson's stabbing of Plaintiff out by the street foreseeable to the Defendants.  "[F]oreseeability must be based on the *probability* that harm will occur, rather than the bare *possibility*."  *Ex parte Wild Wild West Social Club, Inc.*, 806 So.2d 1235, 1241 (Ala. 2001) (quoting  *Hutto v. Gold's Gym, Inc.*, 703 So.2d 974, 976 (Ala.Civ.App.1996) (quoting 65 C.J.S. Negligence § 4(3) (1966))) (emphasis added).  Moreover, the evidence before the court shows that Gipson's wielding of the knife was actually a factor which helped stop the brief fight then in progress and helped calm the situation.

Although any time someone wields a knife, there is a *possibility* that someone could be stabbed, nothing in this record establishes that Defendants had any specialized knowledge or that they knew it was a *probability* that, once outside, Gipson would stab Plaintiff.  Therefore, Plaintiff has failed to present evidence of "special circumstances" which would impose upon Defendant Sigma Nu a duty to protect Plaintiff from Gipson's criminal conduct.

Plaintiff also argues that he had a "special relationship" with Sigma Nu and the Theta Chapter members pursuant to which they had a duty to protect him from Gipson's actions.  This argument misconstrues the nature of the "special relationship" required to establish liability for the criminal acts of a third party.  In *Young v. Huntsville Hospital*, 595 So.2d 1386, 1392 (Ala. 1992), the Alabama Supreme Court held that such a "special relationship" existed between a hospital and an anesthetized patient.  In that case, the Supreme Court "applied a dependence test" to determine

17

whether the situation constituted a "special relationship." *See Gess v. U.S.*, 952 F.Supp. 1529, 1553 (M.D. Ala. 1996) (citing *Young*, 595 So.2d at 1387)).   In *Gess*, the court found that a "special relationship" existed between a newborn baby and a hospital nursery.   In *Thetford v. City of Clanton*, 605 So.2d 835, 841 (Ala. 1992), the Alabama Supreme Court allowed the issue of the existence of a "special relationship" to go to the jury where a woman and her child checked into a hotel to escape an abusive husband, specifically informed the hotel of the circumstances, and asked the hotel not to tell her husband she was staying there.   In *Sacuzzo v. Krystal*, 646 So.2d 595, 597 (Ala. 1994), the Alabama Supreme Court held that there was no special relationship between a premises owner and a patron regarding a shooting incident, even where there was evidence that the police had been called to the restaurant more than 160 times in the 18 months preceding the incident.

In this case, there is no evidence of a significant crime rate.   There is no evidence that Plaintiff was "uniquely dependent" on Sigma Nu or Theta Chapter members for protection.   Plaintiff was simply not in a "special relationship" with Sigma Nu which would impose upon it a duty to protect him from Gipson's criminal act.

Plaintiff's failure to present evidence establishing the existence of either a special relationship or special circumstances renders him subject to the general rule that "a person has no duty to protect another from criminal acts of a third person." *Moye*, 499 So.2d at 1370.   Absent such a duty, Plaintiff cannot maintain his negligence claim against Sigma Nu.[4]

---

[4]"To establish negligence, a plaintiff must prove: (1) *a duty* to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So.2d 564, 567 (Ala. 1994) (emphasis added).

C.    Assumption of the Risk

Plaintiff also argues that Gipson's threat to kill some or all of the individuals if he ever saw them again, which occurred almost immediately before he stabbed Plaintiff, creates the forseeability required to impose liability on Sigma Nu for Gipson's actions.  Considering Plaintiff was front and center to hear the threat himself, his argument lacks logic.  Furthermore, this evidence, together with what happened after the threat, establishes the contrary.

"Alabama has long recognized the affirmative defense of assumption of the risk." *Ex parte Barran*, 730 So.2d 203, 206 (Ala. 1998).  "The general principle of assumption of the risk is that '[a] plaintiff who voluntarily assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm.'" *Barran*, 730 So.2d at 206 (quoting *Restatement (Second) of Torts* § 496A (1965)).  "Assumption of the risk has two subjective elements: (1) the plaintiff's knowledge and appreciation of the risk; and (2) the plaintiff's voluntary exposure to that risk." *Barran*, 730 So.2d at 206 (quoting *Driver v. National Security Fire & Casualty Co.*, 658 So.2d 390, 393 (Ala. 1995)).

Plaintiff argues that summary judgment is inappropriate on the issue of contributory negligence or assumption of the risk.  "Questions of assumption of the risk are often within the province of the jury, but if there is no genuine issue of material fact, that is, if reasonable persons must draw the same conclusion, then whether the plaintiff has assumed the risk becomes a question of law for the court." *Barran*, 730 So.2d at 206 (ruling that the trial court was correct in concluding as a matter of law that the plaintiff had voluntarily exposed himself to the risk at issue).

Plaintiff was not part of the group attempting to encourage Gipson and Barnes to leave the house after the party had ended.  Nor was he an active member of Sigma Nu at the time of the party.

19

Despite that fact, Plaintiff *joined* the existing group escorting Gipson and Barnes from the house. Plaintiff could have chosen to stay out of the fray, particularly since the party was ending. Instead he chose to get involved front and center. Plaintiff claims that when the Theta Chapter Members heard Gipson's threat (that if he saw them again, he would kill them), it created an awareness of risk and thus *a duty for them* to protect *him*. However, it is undisputed that Plaintiff was right there to hear Gipson's threat, too. If Plaintiff's argument is to be credited, then he, too, having heard the threat, was aware of potential danger. Having heard the threat first hand, Plaintiff did not seek to avoid possible danger. He could have turned away. Instead, after hearing the threat *and* observing Gipson's companion throw a beer bottle at someone nearby, it is undisputed that "Plaintiff and Gipson moved *toward one another* simultaneously." (Doc. # 55 at 16, ¶ 39). Thus, Plaintiff exposed himself to the risk presented by an unknown man making death threats. In light of these undisputed facts, the court has no difficulty concluding that Plaintiff assumed the risk by virtue of his voluntary interaction with Gipson.[5]

**D.    *Respondeat Superior***

Even if Plaintiff had presented evidence that the Theta Chapter members breached a duty owed to Plaintiff, Sigma Nu is still entitled to summary judgment on Plaintiff's negligence claim because he has failed to establish a basis for holding Sigma Nu liable for the Theta Chapter members' actions (or inaction as the case may be). As discussed above, the facts of this case do not establish a master-servant relationship between either of the Defendants and the Theta Chapter

---

[5]Although one's actions on one occasion do not dictate how one will act on another occasion, there is also evidence in the record that the incident between Plaintiff and Gipson was not the first time that Plaintiff had involved himself in a fight while attending the University. Beacham at 171:15 - 174:24.

20

members.  "In the absence of proof that a master-servant relationship existed in respect to the transaction out of which the plaintiff's injury arose, the doctrine of *respondeat superior* has no application." *Johnson v. Passmore*, 581 So.2d 830, 832 (Ala. 1991) (citing *Jessup v. Shaddix*, 275 Ala. 281, 154 So.2d 39 (1963)).  As already discussed above, there exists no master-servant relationship between the Theta Chapter members and the Defendants in this case.  Fraternities "are based upon fraternal, not paternal relationships."  *Sullivan*, 524 Pa. 356, 572 A.2d 1209 (1990). Therefore, Plaintiff has failed to establish any basis for *respondeat superior* liability against Defendant Sigma Nu.

**E.    Wantonness**

"To establish wantonness, Plaintiffs must demonstrate 'that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.  To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.'"  *Davis v. Wal-Mart Stores, Inc.*, 64 F.Supp.2d 1176, 1178 (M.D. Ala. 1999) (quoting *Martin v. Arnold*, 643 So.2d 564, 567 (Ala. 1994)).  Plaintiff's negligence and wantonness claims allege that Sigma Nu breached a duty (as opposed to consciously harming Plaintiff through some affirmative act).   The court has already concluded that: (1) neither Defendants, nor the non-party Theta Chapter members, owed a duty to Plaintiff under the circumstances; and (2) even if there was such a duty and it had been breached, there is no basis for respondeat superior liability.  Conduct that is insufficient to support a negligence claim generally will not give rise to a wantonness claim, which requires an even higher degree of culpability.

> Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as ... a conscious ... act.  Simple negligence is the inadvertent omission of duty; and wanton

21

or willful misconduct is characterized as such by the state of mind with which the act
or omission is done or omitted.

*Tolbert v. Tolbert*, 903 So.2d 103, 114-15 (Ala. 2004) (internal citations and quotations omitted).

Therefore, for the same reasons that Defendant Sigma Nu is entitled to summary judgment on

Plaintiff's negligence claim, it is also entitled to summary judgment on Plaintiff's wantonness claim.

**V.      Conclusion**

For the reasons explained above, Defendants' Motion for Summary Judgment is due to be

granted.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____15th_____ day of September, 2008.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

22